UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**USDC-SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC#:**
**DATE FILED:** 03/31/2017

---

OTIS A. DANIEL,

        Plaintiff,

    v.

ABM INDUSTRIES, INC. and LOCAL 32BJ
SEIU, THE PROPERTY SERVICE
WORKERS UNION,

        Defendants.

---

No. 16-CV-1300 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Otis A. Daniel, proceeding *pro se*, brings discrimination and retaliation claims against his former employer, ABM Security Services, Inc. ("ABM"), and Service Employees International Union, Local 32BJ ("Local 32BJ" or the "Union").[1] Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons that follow, Local 32BJ's motion is granted in its entirety. ABM's motion is granted in part and denied in part.

## BACKGROUND[2]

### I.    Employment at ABM

Plaintiff describes himself as a black gay man from St. Vincent and the Grenadines. Compl. ¶¶ 50, 114. In October or November 2013, he began working for ABM, a provider of building facility services, as a fire safety director at Amtrak/Penn Station in Manhattan. *Id.* ¶¶ 1,

---

[1] Defendants contend that they are identified inaccurately in the Complaint. The Court will amend the caption to conform to the names provided by Defendants if no objection is received within ten days.

[2] The following facts are taken from the Complaint and its exhibits and are assumed to be true for purposes of this motion. *See Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 403 (2d Cir. 2015); *Romero v. Local Union 272*, No. 15-CV-7583 (GHW), 2016 WL 5376210, at *4 (S.D.N.Y. Sept. 26, 2016).

62, 72; Ex. 2, at 1–3.[3] Amtrak/Penn Station was ABM's client. Compl. ¶ 1. During Plaintiff's employment at the Amtrak/Penn Station work site, he was a member of Local 32BJ and his employment was subject to the terms of a collective bargaining agreement ("CBA") between ABM and Local 32BJ. *See id.* ¶¶ 1, 102. Plaintiff's starting wage was $17.40 per hour. *Id.* ¶ 73. When he left the Amtrak/Penn Station position in February 2015, he was earning $18.15 per hour. *Id.*

Plaintiff had a fraught relationship with one of his colleagues at Amtrak/Penn Station, Johnny Arocho. Plaintiff describes Arocho as a "White light skin Hispanic male" and alleges that ABM gave Arocho "racial preference." *Id.* ¶ 7. Specifically, Plaintiff alleges that Arocho was "engaged in the production and distribution of bootleg videos while on duty" and that this practice was permitted by Plaintiff's and Arocho's supervisor, James Petrie. *Id.* ¶¶ 98–99. Plaintiff also alleges that Arocho took "excessive days off." *Id.* ¶ 97. According to the Complaint, it is "more than likely" that Plaintiff would not have been allowed to engage in the production and distribution of bootleg videos at work or take as many days off. *Id.* ¶¶ 97, 99. Arocho, like Plaintiff, worked as a fire safety director, although Arocho was more senior. *Id.* ¶ 156; Ex. 2, at 15.

On March 16, 2014, Plaintiff e-mailed Petrie to complain about Arocho's "lack of communication" about scheduling. Ex. 2, at 6. Plaintiff told Petrie that Arocho was "taking advantage of his close . . . friendship with the clients" and indicated that he was prepared to share his concerns directly with the client. *Id.* Plaintiff threatened to take legal action against ABM if the problem persisted. *Id.* Petrie told Plaintiff that ABM management would handle the situation and instructed Plaintiff not to speak directly to the client, advising him that he would receive a

---

[3] The exhibits to the Complaint are cited as "Ex." Citations to such exhibits reflect the pagination assigned by the Court's Electronic Case Filing ("ECF") system.

written warning if he did. *Id.* According to Plaintiff, Arocho, unlike Plaintiff, was allowed to air grievances with the client. Compl. ¶ 100; Ex. 2, at 6.

On July 10, 2014, Plaintiff e-mailed Petrie to request a transfer from the Amtrak/Penn Station work site, noting that he had become "increasingly unhappy and dissatisfied" at that location. Ex. 2, at 8. In the alternative, Plaintiff requested medical leave due to mental health issues. *Id.* Plaintiff was given two weeks' unpaid leave. Compl. ¶ 54. On August 27, 2014, Plaintiff renewed his request for a transfer. Ex. 2, at 13. He indicated that he was interested in "an evening or overnight shift full time or part time" and that he was willing to work as a fire safety director or as a "regular security guard." *Id.* His request was not immediately granted.

A series of incidents occurred in February 2015, however, that culminated in Plaintiff being transferred to another location. On the morning of February 24, 2015, Arocho allegedly entered the "work area" at Amtrak/Penn Station and began to "insult and berate" Plaintiff, apparently without provocation. Compl. ¶ 77 ("[I]f you don't want to be here get the fuck out, get the fuck out of here, do your job, do your fucking job, do your fucking job, you dumb fuck"; "I'm smarter than your dumb ass any day you dumb fuck."). Plaintiff alleges that Arocho then left the work area to go speak with the client's in-house fire safety director, Gary Hearn, only to return shortly after and "continue[ ] the loud verbal assault." *Id.* ¶ 78. About fifteen minutes later, Hearn came to the work area and instructed Plaintiff to leave, which Plaintiff did. *Id.* ¶ 79.[4]

Early the next morning, Plaintiff was back at work and a technician from United Fire Protection ("UFP") arrived at the work area. *Id.* ¶¶ 82–83. UFP had a contract with Amtrak/Penn Station "to service its fire protection detection emergency alarm systems," *id.* ¶ 86, but Plaintiff

---

[4] Shortly after the altercation with Arocho, Plaintiff e-mailed Petrie recounting the incident in substantially similar terms. *See* Ex. 2, at 15.

3

was not expecting anyone from UFP during his shift, *id.* ¶ 83. According to the Complaint, Plaintiff asked the UFP technician to identify himself, and in response the technician became "angry, uncooperative and verbally argumentative." *Id.* The technician eventually identified himself to Plaintiff, but left the work area "visibl[y] upset" and told Plaintiff that he was going to call Arocho. *Id.* The technician later came back to the work area with a colleague, where they worked alongside Plaintiff for several hours without incident. *Id.* ¶¶ 84–85.

Plaintiff had another shift later the same day. *Id.* ¶ 87. When he arrived, Arocho informed him that he was being removed from the work site at the client's request. *Id.* Arocho spoke with ABM's field supervisor, Sylvan Campbell, on the telephone, and Campbell later arrived at the work site and confirmed that Plaintiff was being removed. *Id.* ¶¶ 87–88. According to the Complaint, Campbell told Plaintiff not to worry about his removal because ABM was "desperate" for fire safety directors and would be able to give Plaintiff another position. *Id.* ¶ 90.

On February 27, 2015, two days after he was notified of his removal from Amtrak/Penn Station, Plaintiff e-mailed Petrie and three other ABM employees claiming that Petrie and Arocho had "arranged [his] removal." Ex. 2, at 16. Plaintiff indicated that he was trying to get assigned to another site, but that Petrie was impeding those efforts. *Id.*; *see also* Compl. ¶¶ 16, 44, 91. Plaintiff's e-mail was forwarded to ABM's investigations department the same day. Ex. 2, at 18. On March 1, 2015, Plaintiff e-mailed the same group accusing Petrie and Arocho of "deliberate, malicious, racist favoritism and lies" and "treating employees, especially black male workers as if they are second class citizens." *Id.* at 23. Plaintiff indicated that he intended to file a lawsuit or a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"). *Id.* Plaintiff made similar assertions in a March 2, 2015 e-mail to Kathryn Ciallella, an ABM human resources manager who had contacted Plaintiff to discuss the Amtrak/Penn Station incident. *Id.* at 21–22.

4

On March 3, 2015, Petrie e-mailed Plaintiff to offer him a new fire safety director position. *Id.* at 24. The position was full-time and paid $15.50 per hour, and was covered by ABM's contract with Allied International Union. *Id.*; Compl. ¶ 102. Plaintiff sent a reply rejecting the position because the shift was during the day and he could only work evening or night shifts. Ex. 2, at 24. Plaintiff again asserted that Petrie had "maliciously and deliberately fabricated [the] reason[ ] for [Plaintiff's] removal" from the Amtrak/Penn Station site. *Id.* Hal Brager, ABM's Director of Labor Relations, responded to Plaintiff's e-mail, stating that the client had requested Plaintiff's removal and that ABM would send Plaintiff a "layoff letter." *Id.* at 25.

On March 6, 2015, Plaintiff spoke with Ciallella, and Ciallella offered Plaintiff a position as a security guard at Riverside Church. *Id.* at 28; Compl. ¶ 106. Plaintiff accepted this position on March 9, 2015, even though the position paid only $13.00 per hour. Ex. 2, at 28. Like the position that Petrie had offered, the position at Riverside Church was covered by ABM's contract with Allied International Union, not Local 32BJ. Compl. ¶ 125. On March 11, 2015, Ciallella informed Plaintiff that ABM had conducted an investigation into his removal from the Amtrak/Penn Station site and had found no policy violation or misconduct. Ex. 3, at 1. Plaintiff disputes that this investigation actually took place. Compl. ¶ 105.

Plaintiff was not at Riverside Church for long. On March 19, 2015, Plaintiff was at work and was approached by Abideen Bakare, the shift fire safety director and supervisor. *Id.* ¶ 109. Plaintiff and Bakare, a black male, discussed an e-mail that Bakare had supposedly received from Leroy Thomas, ABM's security director at Riverside Church. *Id.* ¶¶ 108–09; Ex. 2, at 36. According to the Complaint, Bakare told Plaintiff that Thomas had complained in his e-mail about the security guards at Riverside Church being "ghetto." Compl. ¶ 110. Thomas also allegedly described the guards as "unprofessional, rude, disrespectful, dirty street thugs" who "walk around

5

with headphone[s] in their ears and pants down their waist." *Id.* Thomas's remarks were apparently not directed at Plaintiff, but Bakare said that he was sharing them with Plaintiff because Bakare did not "want [Plaintiff] to have this problem" and "jeopardize [his] job." *Id.*

During the same conversation, Bakare allegedly confronted Plaintiff about Plaintiff having made a homophobic remark during a gay wedding at the Church on March 14, 2015. *Id.* ¶ 111. Plaintiff asserts that Bakare was "questioning [Plaintiff's] sexual orientation and nothing else." *Id.* ¶ 112. Plaintiff was angered by the exchange with Bakare and left the work site. *Id.*

Shortly after the exchange with Bakare, Plaintiff e-mailed Ciallella and Petrie, informing them of the incident, and announcing that he would visit ABM's office the next day to "further clarify [the] matter and to discuss [his] employment option(s)." Ex. 2, at 36. On March 20, 2015, Plaintiff met with Ciallella and Brager. Compl. ¶ 119. During the meeting, Plaintiff was told to seek employment with another company. *Id.* ¶¶ 115–16. Also on March 20, Ciallella sent Plaintiff a letter confirming that Plaintiff's employment with ABM at Riverside Church had been terminated. Ex. 3, at 2. The letter stated that Plaintiff had "requested to be removed from [the] job site," and that Plaintiff was being laid off because there were no other available positions. *Id.* Plaintiff has not been recalled by ABM since his layoff. Compl. ¶¶ 117–18.

## II.    Complaint with Local 32BJ

Plaintiff also filed a complaint at the Local 32BJ office on March 20. *Id.* ¶ 120. The Union's intake form states that Plaintiff claimed "that he was unjustly or improperly laid off from his work location effective 3/24/2015." Ex. 2, at 38.[5] Plaintiff alleges that "J.P.," the union

---

[5] Plaintiff alleges that this date should have been February 25, 2015, as his complaint was intended to challenge his removal from the Amtrak/Penn Station work site. Compl. ¶ 127. With respect to this inaccuracy, Plaintiff asserts, somewhat cryptically, that "ABM and Local 32BJ [have] the means or methods to forge someone's signatures and create false company and or employee documents." *Id.*

6

representative who assisted him with his complaint, "put words in [his] mouth and rushed [him] through the process." Compl. ¶ 121. J.P. initially told Plaintiff that he only had twenty days to submit a grievance and that his grievance might therefore be untimely. *Id.* After consulting with an attorney, however, J.P. informed Plaintiff that he actually had 120 days. *Id.*

On March 24, 2015, Plaintiff spoke with Johnny Herrera, a Local 32BJ representative, by telephone. *Id.* ¶ 122. Herrera informed Plaintiff that the deadline for filing a grievance was in fact twenty days and that Local 32BJ might not be able to assist Plaintiff. *Id.* Herrera also advised Plaintiff that under the terms of the CBA, ABM should have transferred Plaintiff to another position covered by the CBA with a comparable job title and pay rate after his removal from the Amtrak/Penn Station site. *Id.* ¶ 123. Plaintiff alleges that he was not aware of his rights under the CBA or his deadline for filing a grievance before he spoke with Herrera on March 24. *Id.* ¶ 126.[6] According to Plaintiff, if he had been aware, then he would not have accepted the Riverside Church position (which was not a Local 32BJ position), and would have sought to file a grievance sooner. *Id.* During the March 24 call, Herrera told Plaintiff that he would speak with Brager and get back to Plaintiff. *Id.* ¶ 129.[7] Plaintiff alleges that Herrera communicated with Brager and that Brager "lied to . . . [Herrera] about the reasons or causes" for Plaintiff's layoff. *Id.* ¶ 25.

On March 24, Dan Wilson, Local 32BJ's Complaint and Arbitration Coordinator, sent a letter to Brager notifying him of Plaintiff's complaint. Ex. 2, at 40. Wilson sent another letter on March 31, 2015, noting that the Union and ABM had "been unable to resolve the dispute" and that

---

[6] Plaintiff alleges that Arocho and two other "White light skin Hispanic" co-workers received information about their "employee/union benefits or rights" and that ABM and J.P. and Herrera "deliberately chose not to inform [Plaintiff] about [his] employee/ union benefits or rights in part or in whole because of [his] race/color." Compl. ¶¶ 10, 132.

[7] Plaintiff alleges that Herrera also told him that he "sound[ed] like a paranoid schizophrenic and a conspiracy theorist." Compl. ¶ 129.

the Union was submitting the grievance for arbitration. *Id.* at 41. Both letters stated that Plaintiff alleged "that he was unjustly removed from his work location effective February 24, 2015." *Id.* at 40–41. Plaintiff alleges that ABM did not respond to either of the letters. Compl. ¶¶ 119, 131.

## III.    NYSDHR/EEOC Complaint

On April 23, 2015, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") alleging that ABM discriminated against him on the basis of race and color. *Id.* ¶ 134; Ex. 1, at 53–64. Plaintiff alleged that Local 32BJ was aware of ABM's "discriminatory practices and helped to facilitate [ABM's conduct]." Compl. ¶ 134. Plaintiff also filed a complaint with the EEOC. *Id.* On October 16, 2015, the NYSDHR issued a final determination and order and dismissed Plaintiff's complaint. *Id.* ¶ 138; Ex. 1, at 11–14. On December 2, 2015, the EEOC adopted the findings of the NYSDHR and issued Plaintiff a right to sue letter. Compl. ¶ 139.

## IV.    Local 32BJ's Decision Not to Arbitrate

On December 11, 2015, Local 32BJ notified Plaintiff that it had "carefully reviewed the facts and circumstances surrounding [Plaintiff's] grievance and . . . determined that it lack[ed] sufficient merit for [Local 32BJ] to be likely to prevail in arbitration." Ex. 7, at 9. Plaintiff was informed of his right to appeal Local 32BJ's decision, which he exercised the next day. *Id.*; Compl. ¶¶ 159–60. The appeal hearing was scheduled for January 14, 2016. Ex. 7, at 15; Compl. ¶ 160. On January 6, 2016, Plaintiff met with Local 32BJ associate general counsel Amie Ravitz to discuss the appeal process. Compl. ¶ 161. Following that meeting, Plaintiff e-mailed Ravitz to inform her that he did not intend to pursue his appeal. *Id.* ¶ 162; Ex. 7, at 31–35. Plaintiff alleges that the Union never investigated his complaint, and never intended to do so. Compl. ¶ 135.

8

## STANDARD OF REVIEW

In considering this motion, the Court "accept[s] as true the allegations in the complaint and draw[s] all reasonable inferences in favor of the plaintiff." *Atterbury,* 805 F.3d at 403. "This rule applies with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se*." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) (quotation marks omitted). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where, as here, the complaint was filed *pro se*, it must be construed liberally with special solicitude and interpreted to raise the strongest claims that it suggests." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (quotation marks omitted). "Nonetheless, a *pro se* complaint must state a plausible claim for relief." *Id.*

## DISCUSSION

Plaintiff asserts discrimination and retaliation claims against ABM and Local 32BJ under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.* Plaintiff's claims appear to center around Plaintiff's transfer from the Amtrak/Penn Station work site, his discharge from ABM, Defendants' alleged failure to provide him with information about his rights as an ABM employee and member of Local 32BJ, ABM's alleged failure to investigate Plaintiff's transfer from Amtrak/Penn Station, and the Union's failure to pursue Plaintiff's grievance. The Court

9

dismisses all of Plaintiff's NYSHRL and NYCHRL claims and his Title VII claims against the Union, but finds that Plaintiff has stated claims against ABM under Title VII.

## I.     Plaintiff's State and City Law Claims

The Court lacks subject-matter jurisdiction over any claims under the NYSHRL and NYCHRL that arise out of facts or events that Plaintiff raised before the NYSDHR. "It is well-settled that if a litigant files a discrimination complaint with the NYSDHR, she may not bring a subsequent judicial action based on the same incident." *Benson v. N. Shore-Long Island Jewish Health Sys.*, 482 F. Supp. 2d 320, 325 (E.D.N.Y. 2007).  Under the NYSHRL:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages . . . and such other remedies as may be appropriate . . . unless such person had filed a complaint hereunder or with any local commission on human rights . . . .

N.Y. Exec. Law § 297(9).  The NYCHRL contains a similar provision.  *See* N.Y.C. Admin. Code § 8-502(a).  "Thus, by the terms of the statute and code, respectively, the [NYSHRL] and [NYCHRL] claims, once brought before the NYSDHR, may not be brought again as a plenary action in another court."  *York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 127 (2d Cir. 2002).  "[T]here is no question that [these] provisions . . . apply to federal courts . . . ."  *Id.*; *see also Moodie v. Fed. Reserve Bank of N.Y.*, 58 F.3d 879, 882 (2d Cir. 1995) (holding that the election-of-remedies provision of § 297(9) deprives federal courts of subject-matter jurisdiction).

"Where a sufficient identity of issue exists between a complaint before the [NYSDHR] and a complaint before the Court," the action before the Court is barred.  *Smith-Henze v. Edwin Gould Servs. for Children & Families*, No. 06-CV-3049 (LBS), 2006 WL 3771092, at *4 (S.D.N.Y. Dec. 21, 2006) (quotation marks omitted); *see also Ulysse v. FreshDirect, LLC*, No. 14-CV-3556 (PKC), 2015 WL 5692938, at *3 (E.D.N.Y. Sept. 28, 2015) ("[C]ourts have found claims barred where the subsequent claim brought in court arises from the same facts or events investigated by

the NYSDHR."). The only claim that Plaintiff appears to assert in this action that was arguably not raised before the NYSDHR is the claim that Local 32BJ retaliated against Plaintiff by failing to arbitrate his grievance.[8] Although Plaintiff alleged in his NYSDHR complaint that the Union was not acting in his interests, Plaintiff only learned that the Union was not going to proceed with his grievance after the NYSDHR and EEOC rendered their decisions.

Nevertheless, Plaintiff cannot assert NYSHRL and NYCHRL claims under this theory. "Under federal common law, unions owe their members a duty of fair representation ('DFR'), which derives 'from the union's statutory role as exclusive bargaining agent.'" *Dillard v. SEIU Local 32BJ*, No. 15-CV-4132 (CM), 2015 WL 6913944, at \*4 (S.D.N.Y. Nov. 6, 2015) (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 74 (1991)). In the Second Circuit, "the weight of well-reasoned authority . . . finds that claims against a union . . . under the [NYSHRL] and the NYCHRL are subsumed by the duty of fair representation when the gist of the claim is the failure to represent the plaintiff in a fair and non-discriminatory manner." *Morillo v. Grand Hyatt N.Y.*, No. 13-CV-7123 (JGK), 2014 WL 3498663, at \*4 (S.D.N.Y. July 10, 2014) (collecting cases). In other words, "the duty of fair representation arising from the [National Labor Relations Act ('NLRA')] preempts [the NYSHRL] to the extent that the claimed discrimination arises from acts or omissions of a labor organization acting in its role as a collective bargaining representative under the NLRA." *Figueroa v. Foster*, No. 14-CV-8796 (GHW), 2016 WL 2851335, at \*10 (S.D.N.Y. May 12, 2016); *see also Agosto v. Corr. Officers Benev. Ass'n*, 107 F. Supp. 2d 294, 311 (S.D.N.Y. 2000) ("Since [plaintiff's] state law claims of discrimination and retaliation are

---

[8] Although Plaintiff only alleged racial discrimination in his NYSDHR complaint and purports to assert claims for discrimination based on gender, sexual orientation, and national origin in this action, "[m]erely adding a legal theory for liability on the same underlying claim does not suffice to overcome the [election-of-remedies] bar." *Smith-Henze*, 2006 WL 3771092, at \*4. Since the facts alleged in this case are essentially the same as those raised before the NYSDHR, these claims are barred. *See id.*

premised on the duty of fair representation, they are preempted."). Accordingly, Plaintiff has no cause of action against the Union under the NYSHRL or NYCHRL based on the Union's failure to arbitrate his grievance.

## II.    Plaintiff's Federal Claims Against Local 32BJ

Plaintiff's federal claims against Local 32BJ also fail because Plaintiff has not plausibly alleged a breach of the DFR. "To establish a Title VII . . . claim against a union a plaintiff must show that the union breached its duty of fair representation to the employee, and that the union's actions were motivated by unlawful discrimination or retaliation." *Gallop-Laverpool v. 1199 SEIU United Healthcare Workers E.*, No. 14-CV-2879 (JG), 2014 WL 3897588, at \*2 (E.D.N.Y. Aug. 8, 2014); *see also McIntyre v. Longwood Cent. Sch. Dist.*, 380 F. App'x 44, 49 (2d Cir. 2010) (summary order) ("[I]n order to establish a violation of Title VII . . . by [a labor organization], [the plaintiff] would have to show, at a minimum, that the union breached its duty of fair representation and that its actions were motivated by discriminatory animus."). Thus, without a breach of the DFR, "a cause of action under Title VII cannot stand." *Coureau v. Granfield*, 942 F. Supp. 2d 315, 320–21 (E.D.N.Y. 2013), *aff'd*, 556 F. App'x 40 (2d Cir. 2014) (summary order).

To plead a breach of the DFR, a plaintiff must plausibly allege that (1) "the union's actions or inactions are either arbitrary, discriminatory, or in bad faith" and (2) "a causal connection between the union's wrongful conduct and [the plaintiff's] injuries." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (quotation marks omitted). "The bar for finding that a union has breached this duty is high." *Romero*, 2016 WL 5376210, at \*8. "Any substantive examination of a union's performance . . . must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *O'Neill*, 499 U.S. at 78. "To survive a motion to dismiss, a DFR plaintiff must set forth concrete specific

facts from which one can infer a union's discrimination, bad faith or arbitrary exercise of discretion." *Dillard*, 2015 WL 6913944, at \*4 (quotation marks omitted).

"A union's actions are 'arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational.'" *Vaughn*, 604 F.3d at 709 (quoting *O'Neill*, 499 U.S. at 67). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45–46 (1998). "A union's acts are discriminatory when 'substantial evidence' indicates that it engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives.'" *Vaughn*, 604 F.3d at 709 (quoting *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 301 (1971)). A determination that a union acted in "bad faith requires a showing of fraudulent, deceitful, or dishonest action." *White v. White Rose Food*, 237 F.3d 174, 179 (2d Cir. 2001) (quotation marks omitted).

Plaintiff's claims against the Union appear to be premised on the Union's alleged failure to inform Plaintiff of his rights under the CBA and pursue Plaintiff's grievance. As alleged, neither of these omissions constitutes a breach of the DFR because Plaintiff has not "set forth concrete specific facts from which one can infer [the Union's] discrimination, bad faith or arbitrary exercise of discretion." *Dillard*, 2015 WL 6913944, at \*4 (quotation marks omitted).

Plaintiff alleges that that Defendants provided information about "employee/union benefits or rights" to three of his "White light skin Hispanic co-workers," but not to him. Compl. ¶¶ 10–11. This does not constitute "substantial evidence" of discrimination that is "intentional, severe, and unrelated to legitimate union objectives." *Vaughn*, 604 F.3d at 709 (quotation marks omitted). Under federal law, "an employee has a right to obtain a copy of the CBA *upon request*." *Mazza*

13

*v. Dist. Council of N.Y.*, Nos. 00-CV-6854, 01-CV-6002 (BMC), 2007 WL 2668116, at \*14 (E.D.N.Y. Sept. 6, 2007) (citing 29 U.S.C. § 414); *cf. Corr v. MTA Long Island Bus*, 27 F. Supp. 2d 359, 367 (E.D.N.Y. 1998) ("[I]t is beyond cavil that an employer has no duty to inform a union employee of his rights under a collective bargaining agreement."), *aff'd*, 199 F.3d 1321 (2d Cir. 1999). Plaintiff does not allege that he ever requested information about his rights under the CBA, or that such information was furnished to any of his colleagues without request. The mere fact that his colleagues received information that he did not is not substantial evidence of discriminatory conduct. *See Vaughn*, 604 F.3d at 712. Nor can the Court conclude that the Union's alleged failure to inform Plaintiff of his rights was arbitrary or in bad faith. *See Bejjani v. Manhattan Sheraton Corp.*, 567 F. App'x 60, 63 (2d Cir. 2014) (summary order) ("[P]laintiffs have cited no authority holding that the duty of fair representation requires disclosure of all agreements that may in some way affect certain union members.").

Plaintiff's assertion that Local 32BJ failed to investigate his grievance is undermined by his own allegations, which demonstrate that the Union's representatives spoke with Plaintiff on at least three occasions regarding his complaint, notified ABM of the grievance, attempted to resolve the dispute with ABM, and obtained at least some information from ABM regarding Plaintiff's employment. *See* Compl. ¶¶ 25, 120–29, 161; Ex. 2, at 40–41. These allegations do not suggest that Local 32BJ failed to investigate Plaintiff's grievance; rather, they "suggest that the Union took action on [Plaintiff's] behalf and that [Plaintiff] disagreed with the outcome." *Romero*, 2016 WL 5376210, at \*8. Plaintiff has thus failed to plausibly allege that the Union's handling of Plaintiff's grievance was arbitrary, discriminatory, or in bad faith. Any review of the Union's conduct must afford the Union latitude "to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez*, 525 U.S. at 45–46. Allegations that the Union failed to conduct

14

a "sufficiently thorough investigation," without more, are not enough to demonstrate a breach of the DFR. *Dillard*, 2015 WL 6913944, at *6; *see also Romero*, 2016 WL 5376210, at *8.

To the extent that Plaintiff alleges that Local 32BJ declined to arbitrate the grievance in retaliation for Plaintiff's NYSDHR and EEOC complaints, that theory is also unavailing. The mere fact that Plaintiff named the Union as a respondent in the complaints and that the Union later decided not to pursue arbitration does not, without more, support an inference of discrimination, bad faith, or arbitrary exercise of discretion. At the time the Union made the decision not to arbitrate the grievance, the Union had the benefit of the NYSDHR and EEOC findings with respect to Plaintiff's transfer from Amtrak/Penn Station, which was the subject of the grievance. These findings could only have supported the Union's decision not to arbitrate.

## III.  Plaintiff's Federal Claims against ABM

Plaintiff's Title VII claims against ABM fare somewhat better. Although the strength of Plaintiff's allegations appears far from overwhelming, the Court finds that he has stated a claim for retaliation based on his transfer from Amtrak/Penn Station and for retaliation and discrimination based on his discharge. Plaintiff has not, however, stated a claim under Title VII in connection with ABM's alleged failure to provide him with information about his rights and benefits or its alleged failure to investigate his transfer from Amtrak/Penn Station.

### A.  Discrimination

"[I]n an employment discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015).[9]  "A plaintiff sustains an adverse employment action if he or she

---

[9] Plaintiff purports to assert claims for discrimination on the basis of race, color, gender, sexual orientation, and national origin. The analysis that follows deals only with the racial discrimination claim

15

endures a materially adverse change in the terms and conditions of employment." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quotation marks omitted). The action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quotation marks omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (quotation marks omitted). At the pleadings stage, a plaintiff only has "a *minimal* burden of alleging facts suggesting an inference of discriminatory motivation." *Vega*, 801 F.3d at 85 (quotation marks omitted). A plaintiff may accomplish this "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* at 87. Such an inference can arise from circumstances such as an "employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quotation marks omitted).

## 1. Failure to Provide Information

As discussed above, Plaintiff alleges that ABM provided information about "employee/union benefits or rights" to three of his "White light skin Hispanic co-workers," but not to him. Compl. ¶¶ 10–11. Whether or not this constitutes an adverse employment action,

_____

because Plaintiff alleges no facts that could support claims based on gender, sexual orientation, and national origin. The Court thus need not address ABM's argument that Plaintiff's gender, sexual orientation, and national origin claims are barred by Title VII's exhaustion requirement, ABM Mem. at 13–15, because contrary to ABM's assertion, Title VII exhaustion is not jurisdictional, *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000).

16

Plaintiff has not plausibly alleged that his race was a factor in ABM's alleged failure to provide the information at issue. "A plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quotation marks omitted). Plaintiff has not alleged that he ever asked for information about his rights and benefits, or that it was given to his colleagues unprompted. This is akin to alleging discrimination for failure to hire without alleging that he sought the position. *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998) ("We read *McDonnell Douglas* and *Burdine* generally to require a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion."); *Gaffney v. Dep't of Info. Tech. & Telecomms.*, 536 F. Supp. 2d 445, 460 (S.D.N.Y. 2008) (granting summary judgment with respect to a failure to hire claim where the plaintiff did not apply for the vacancies at issue and failed to "allege[ ] or establish[ ] . . . that an ex-employee who did not apply for a vacancy . . . was nonetheless hired to fill that vacancy"). Plaintiff has thus failed to state a claim with respect to ABM's alleged failure to provide information.

## 2.    Transfer from Amtrak/Penn Station

Plaintiff's transfer from Amtrak/Penn Station qualifies as an adverse employment action because it was "a demotion evidenced by a decrease in wage or salary." *Terry*, 336 F.3d at 138 (quotation marks omitted). Plaintiff alleges that at the time he left Amtrak/Penn Station, he was earning $18.15 per hour. Compl. ¶ 73. After notifying Plaintiff that he was being removed from the Amtrak/Penn Station site, ABM offered Plaintiff another fire safety director position that paid $15.50 per hour, which Plaintiff rejected due to a scheduling conflict. Ex. 2, at 24. The position

17

that Plaintiff ultimately accepted at Riverside Church paid $13.00 per hour. *Id.* at 28. Despite the fact that Plaintiff rejected ABM's initial offer, even the initial offer involved a significant pay cut.

The Court must therefore determine whether Plaintiff has plausibly alleged that his race was a motivating factor in his transfer. Plaintiff has not alleged any facts that directly show that the transfer was discriminatory. He attempts instead to plead "facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega*, 801 F.3d at 87. As noted, Plaintiff alleges that information about "employee/union benefits or rights" was distributed in a racially discriminatory manner. Compl. ¶¶ 10–11. He also alleges that Arocho was given "racial preference" in that he was permitted to air workplace grievances with ABM's client, whereas Plaintiff was expressly forbidden from doing so. *Id.* ¶¶ 7, 100; Ex. 2, at 6. Lastly, Plaintiff alleges that Arocho was permitted to "engage[ ] in the production and distribution of bootleg videos while on duty" and take "excessive days off," although Plaintiff does not claim to have been denied the right to do the same. Compl. ¶¶ 97–99.

Plaintiff has only a minimal burden at this stage, but these allegations do not give rise to an inference of discrimination. For the reasons just discussed, Plaintiff's allegations about the distribution of information about rights and benefits do not make his assertion of discriminatory intent plausible. Plaintiff's allegations concerning Arocho's communications with the client are similarly unpersuasive. The Court is required to "draw on its judicial experience and common sense" in assessing plausibility. *Iqbal*, 556 U.S. at 679. The allegation that Plaintiff's supervisor favored one of Plaintiff's non-black colleagues on one occasion in a manner that had no clear nexus to race and in a context unrelated to Plaintiff's transfer is insufficient to establish even a minimal inference that the supervisor acted with discriminatory intent in connection with that transfer. As for Plaintiff's allegations regarding his supervisor's tolerance of Arocho's "bootleg

18

videos" and "excessive days off," any implication of preferential treatment that might arise from those allegations is entirely speculative. Plaintiff has thus failed to state a claim for discrimination with respect to his transfer from Amtrak/Penn Station to Riverside Church.

### 3.   Failure to Investigate

Plaintiff also alleges that ABM failed to conduct an investigation into his removal from Amtrak/Penn Station. Compl. ¶ 105. This does not constitute an adverse employment action for purposes of a discrimination claim under Title VII. *See Rogers v. Fashion Inst. of Tech.*, No. 14-CV-6420 (AT), 2016 WL 889590, at \*5 (S.D.N.Y. Feb. 26, 2016); *Nunez v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 14-CV-6647 (JMF), 2015 WL 4605684, at \*17 (S.D.N.Y. July 31, 2015). Plaintiff has thus failed to state a discrimination claim with respect to ABM's alleged failure to investigate Plaintiff's removal from Amtrak/Penn Station.

### 4.   Discharge

Plaintiff has, however, plausibly alleged an adverse employment action in connection with his discharge from ABM. On March 19, 2015, Plaintiff left the Riverside Church work site after a conversation with Bakare, the shift supervisor. Compl. ¶¶ 109–12. The following day, Plaintiff met with ABM and apparently agreed to terminate his employment at the Riverside Church location. *Id.* ¶ 119; Ex. 3, at 2. Plaintiff was laid off due to a lack of available positions, and told to seek employment with another company. Compl. ¶¶ 115–16; Ex. 3, at 2. Plaintiff alleges that only after he filed his NYSDHR complaint was he discharged. *See* Compl. ¶ 118.

This alleged discharge was an adverse employment action. "A layoff . . . is ordinarily a 'period of temporary dismissal'; inherent in the term is the anticipation of recall." *CBS Inc. v. Int'l Photographers of Motion Picture Indus., Local 644*, 603 F.2d 1061, 1063 (2d Cir. 1979) (citing *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 287 n.11 & 286–87 (1946)). By

19

contrast, "[a] discharge normally means the 'termination of the employment relationship or loss of a position.'" *Id.* (quoting *Fishgold*, 328 U.S. at 286); *see also Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 88 (2d Cir. 1996) ("An actual discharge, in the context of Title VII as in other contexts, occurs when the employer uses language or engages in conduct that would logically lead a prudent person to believe his tenure has been terminated." (quotation marks omitted)). "An adverse employment action includes discharge, disciplining, and any action that affects 'promotions, transfers and recalls after layoffs.'" *Johnson v. Reliable Mail Serv., Inc.*, No. 99-CV-5877 (LMM), 2001 WL 1506007, at *3 (S.D.N.Y. Nov. 26, 2001) (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990)). Given that Plaintiff appears not to have been recalled following his layoff, *see* Compl. ¶ 117, he has plausibly alleged that he was discharged.

Plaintiff has also met the "*minimal* burden of alleging facts suggesting an inference of discriminatory motivation." *Vega*, 801 F.3d at 85 (quotation marks omitted). "An inference of discrimination can arise from . . . [an employer's] invidious comments about others in the employee's protected group," *Littlejohn*, 795 F.3d at 312 (quotation marks omitted), and Plaintiff need only allege that "his race . . . was a motivating factor in the employment decision," *Vega*, 801 F.3d at 86. According to the Complaint, on March 19, 2015, Bakare told Plaintiff that Thomas, ABM's security director at Riverside Church, had described ABM's security guards as "ghetto" and as "unprofessional, rude, disrespectful, dirty street thugs" who "walk around with headphone[s] in their ears and pants down their waist." Compl. ¶¶ 108–10. Bakare warned Plaintiff not to behave in a similar way if he wanted to keep his job. *Id.* ¶ 110. While these comments may not have been facially discriminatory, "Title VII can hear racism sung in the whistle register." *Lloyd v. Holder*, No. 11-CV-3154 (AT), 2013 WL 6667531, at *9 (S.D.N.Y. Dec. 17, 2013) (recognizing that "facially non-discriminatory terms" like "welfare queen, terrorist,

thug, [and] illegal alien" "can invoke racist concepts" (quotation marks omitted)). Viewed in the light most favorable to Plaintiff, these allegations suggest that an ABM employee with authority over Plaintiff criticized Plaintiff's co-workers using language with racial overtones, that Plaintiff's shift supervisor cited that language in warning Plaintiff about the safety of his own job, and that ABM discharged Plaintiff a short time later. This is sufficient to state a claim for discrimination.

## B. Retaliation

To state a claim for retaliation under Title VII, a plaintiff must plausibly allege: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 315–16 (quotation marks omitted). "Protected activity" is opposing a practice made unlawful by Title VII or making a charge, testifying, assisting, or participating in a Title VII investigation, proceeding, or hearing. *Id.* at 316. "[I]n the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). To establish causation, "a plaintiff must plausibly plead a connection between the act and his engagement in protected activity." *Id.* "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." *Id.*

Plaintiff has alleged at least two instances of protected activity of which ABM was aware: (1) his threat to file an EEOC complaint in connection with his removal from the Amtrak/Penn Station work site and (2) his NYSDHR and EEOC complaints. *See Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001) ("The law protects employees in the filing of formal charges of discrimination . . . ." (quotation marks omitted)); *Gifford v. Atchison, Topeka & Santa Fe Ry. Co.*,

21

685 F.2d 1149, 1156 n.3 (9th Cir. 1982) (holding that there is "no legal distinction . . . between the filing of a charge [with the EEOC,] which is clearly protected, and threatening to file a charge" (citation omitted)); *see also Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 175 (2d Cir. 2005) (quoting *Gifford* with approval).[10] The Court thus considers whether Plaintiff has plausibly alleged that any adverse employment actions were taken against him because of this protected activity.

## 1. Failure to Provide Information

Plaintiff has not stated a claim for retaliation based on ABM's alleged failure to provide him with information about his rights and benefits. As discussed above, Plaintiff does not allege that he ever asked for such information, nor that it was volunteered to his colleagues, but not to him. Plaintiff has not alleged any temporal or other nexus between his protected activity and the failure to provide this information. Indeed, it would appear that his purported non-receipt of information began long before he complained of discrimination or threatened legal action. *See Brutus v. Silverseal Corp.*, No. 06-CV-15298 (LAP), 2009 WL 4277077, at *9 (S.D.N.Y. Nov. 24, 2009) ("The continuation of an adverse employment condition that existed prior to the protected activity undermines an inference that the protected activity prompted the adverse condition."), *aff'd*, 439 F. App'x 28 (2d Cir. 2011) (summary order). Plaintiff has thus at the very least failed to plausibly allege causality.

## 2. Transfer from Amtrak/Penn Station

By contrast, Plaintiff has stated a claim for retaliation based on his transfer from Amtrak/Penn Station to Riverside Church. "The standard for proving a materially adverse

---

[10] "[T]he making of informal protests of discrimination, including making complaints to management," can also constitute protected activity, "so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Gregory*, 243 F.3d at 700–01 (quotation marks omitted). The Court need not decide whether Plaintiff's informal complaints of discrimination satisfy this test, as it does not affect the analysis that follows.

employment action in the retaliation context is less stringent than the standard for proving an adverse employment action in the discrimination context." *Gelin v. Geithner*, No. 06-CV-10176 (KMK), 2009 WL 804144, at *20 (S.D.N.Y. Mar. 26, 2009), *aff'd*, 376 F. App'x 127 (2d Cir. 2010) (summary order). As discussed above, the reduction in Plaintiff's pay makes clear that his transfer was a demotion. Plaintiff's transfer thus constitutes an adverse employment action for purposes of his retaliation claim for the reasons set forth in Section III(A)(2).

Plaintiff has also plausibly alleged "a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 316 (quotation marks omitted). As noted, "[a] retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." *Vega*, 801 F.3d at 90. Plaintiff has done that here. Shortly after Plaintiff was removed from Amtrak/Penn Station, he wrote an email to ABM claiming that his removal was the result of "racist favoritism" and threatening to file an EEOC complaint. Ex. 2, at 23; *see also id.* at 22 (making similar assertions to Ciallella). Within five days of that email, ABM offered Plaintiff two opportunities for reassignment, both of which involved a pay reduction. *Id.* at 24, 28. This closeness in time is sufficient to plausibly allege causation.

### 3.  Failure to Investigate

Plaintiff has not stated a claim for retaliation based on ABM's alleged failure to investigate his removal from Amtrak/Penn Station. "[A]t least in a run-of-the-mine case . . . an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010). Although failure to investigate can constitute an adverse employment action "if the failure is in retaliation for some separate, protected act by the plaintiff," *id.* at 722, Plaintiff's threat to file an EEOC complaint was

made in the same e-mail as his accusation of "racist favoritism," Ex. 2, at 23. It is thus doubtful

that the threat could fairly be described as a "separate, protected act." *Fincher*, 604 F.3d at 722.

Nevertheless, even assuming that it could be, the Court is not convinced that ABM's alleged failure

to investigate Plaintiff's removal would "dissuade a reasonable worker from making or supporting

a charge of discrimination." *Vega*, 801 F.3d at 90 (quotation marks omitted).

In determining what constitutes an adverse employment action for purposes of a retaliation

claim, context is key. *White*, 548 U.S. at 69; *Rivera v. Rochester Genesee Reg'l Transp. Auth.*,

743 F.3d 11, 25 (2d Cir. 2014). In *Rochon v. Gonzalez*, the D.C. Circuit held that an agent of the

Federal Bureau of Investigation ("FBI") had stated a claim for retaliation where he alleged that the

FBI had failed to investigate a complaint about a death threat against the agent and his family. 438

F.3d 1211, 1219–20 (D.C. Cir. 2006).[11] In a subsequent case, the D.C. Circuit characterized the

failure to investigate in *Rochon* as a "failure to remediate . . . [where] the uncorrected action [was]

. . . of enough significance to qualify as an adverse action." *Baird v. Gotbaum*, 662 F.3d 1246,

1249 (D.C. Cir. 2011). Other cases have similarly recognized that a failure to investigate can in

certain circumstances constitute an unacceptable failure to remediate. *See, e.g.*, *Hawkins v.

Anheuser-Busch, Inc.*, 517 F.3d 321, 349 (6th Cir. 2008) (holding that an employer's failure to

investigate allegations that a plaintiff's car was set on fire by a co-worker could constitute an

adverse employment action). However, these are exceptional cases, and Plaintiff has not suggested

that any comparable harm flowed from the failure to investigate in this case. *See Kuhn v. United

Airlines*, 63 F. Supp. 3d 796, 804 (N.D. Ill. 2014) (finding no adverse employment action where

employer "allegedly failed to fully investigate . . . run-of-the-mill harassment or mistreatment

---

[11] *Fincher* cited *Rochon* as an example of an employer's failure to investigate that qualified as an
adverse employment action. 604 F.3d at 722.

complaints, not threats like those in *Rochon* or *Hawkins*"), *aff'd*, 640 F. App'x 534 (7th Cir. 2016). "[A] failure to investigate a complaint, unless it leads to demonstrable harm, leaves an employee no worse off than before the complaint was filed." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 640 (10th Cir. 2012) (citing *Fincher*, 604 F.3d at 721–22). Having alleged no demonstrable harm, Plaintiff has failed to plausibly allege an adverse employment action.

### 4. Discharge

Finally, as discussed above in Section III(A)(4), Plaintiff has plausibly alleged that he was involuntarily discharged following his departure from Riverside Church. A discharge qualifies as an adverse employment action. *See, e.g.*, *Lawrence v. State Univ. of N.Y.*, No. 01-CV-7395 (AKH), 2002 WL 31812700, at \*7 (S.D.N.Y. Dec. 12, 2002) (observing, in the context of a Title VII retaliation claim, that "it is clear that discharge is an adverse employment action"). The temporal proximity between Plaintiff's protected activity and his alleged discharge establishes the required causality. Although Plaintiff does not specify exactly when ABM discharged him, he identifies the filing of his NYSDHR complaint, which occurred on April 23, 2015, as the triggering event. Compl. ¶¶ 118, 134. The Court finds that Plaintiff has plausibly alleged that his discharge occurred around the time of the NYSDHR complaint. Plaintiff has thus stated a claim for retaliation in connection with his discharge. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (finding a period of less than two months between protected activity and an adverse employment action to be sufficiently short to demonstrate causation), *abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

## CONCLUSION

For the foregoing reasons, Local 32BJ's motion is granted in its entirety. ABM's motion is granted with respect to Plaintiff's NYSHRL and NYCHRL claims, but denied with respect to aspects of Plaintiff's Title VII discrimination and retaliation claims, as detailed above. The NYSHRL and NYCHRL claims against both Defendants are dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the motions pending at Docket Numbers 13 and 18.

SO ORDERED.

Dated:   March 31, 2017
         New York, New York

Ronnie Abrams
United States District Judge